TALBOT *v.* UNITED STATES (No. 490). PERRY *v.* UNITED STATES (No. 491). KRAUT *v.* UNITED STATES (No. 492).[1]

1. REFUSAL OF ENTRY.

The tariff act of 1909 was signed at 5.05 p. m. on August 5, and went into effect the next day. Business hours at customhouses, by virtue of reasonable departmental regulations then in force, ended at 4.30 p. m. At that hour certain importation= had not arrived within a collector's jurisdiction: *Held*, under these circumstances a tender of payment of duty under the provisions of the act of 1897, made a few minutes after 4 o'clock, was properly refused for the reason that the importation was not within the jurisdiction and the collector was not bound to keep his office open beyond the regular hour for closing for the purpose of permitting an entry to be made later that day.

2. OFFICE HOURS.

Nothing further appearing, the fact that a new tariff law has been enacted does not of itself create within the meaning of article 1389 of the customs regulations of 1908 an occasion where the "necessities or interests of the public service" require the ordinary business hours of customhouses to be prolonged.

3. SAME—CONSTITUTIONAL RIGHTS.

The fact that a collector at another port voluntarily kept his office open and received entries after the close of regular business hours of August 5, does not lay the foundation for the claim of an unlawful invasion of the constitutional rights of an importer under sections 8 and 9 of Article I of the Constitution of the United States.

## United States Court of Customs Appeals, April 3, 1911.

APPEAL from a decision of the Board of United States General Appraisers, G. A. 7089 (T. D. 30890).

[Affirmed.]

*Brooks & Brooks* (*F. W. Brooks* of counsel) for appellants.

*D. Frank Lloyd*, Assistant Attorney General (*Frank L. Lawrence* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:

The appellants in these cases imported various kinds of merchandise by the steamship *Pennsylvania*, which arrived within the limits of the jurisdiction of the collector of customs at the port of New York on the 5th day of August, 1909, as hereinafter more specifically stated. The tariff act of August 5, 1909, was signed by the President five minutes after 5 o'clock in the afternoon of that day. So far as relates to this case the act went into effect on the day following:

It is provided in section 29 of said act—

That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed

---

by this act and to no other duty, upon the entry or withdrawal thereof: *Provided*, That when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse, said duties shall be levied and collected upon the weight of such merchandise at the time of its entry.

The customhouse at the port of New York closed at 4.30 p. m. on August 5, according to its ordinary practice, authorized under article 1389 of the customs regulations of 1908, which reads as follows:

Customs offices shall be kept open for business on all days of the year, except Sundays, Independence, Christmas, and New Year's days and such other days as may be designated by law, or by the President of the United States, or by the Secretary of the Treasury, between the hours of 9 a. m. and 4.30 p. m., and these hours are to be prolonged when the necessities or interests of the public service require it.

The collector refused to permit entries of the merchandise to be made by appellants tendered during the usual business hours of August 5 on the ground that at the time no information had been received at the customhouse that the vessel carrying the same had arrived within the port and also refused to receive the money to pay duties thereon. Entry was accordingly made on the 6th day of August, 1909, and duties paid on all these importations under the terms of the act of 1909. Protests were duly filed, upon the hearing of which the Board of General Appraisers overruled the same and the cases come here for review.

The record shows that about 4 o'clock of the 5th day of August a representative of the appellant Adolph Kraut presented himself at the office of the collector of customs in New York with entry papers made in customary and proper form for the entering of the merchandise in question and had with him the money required to pay the duties on the importation under the tariff act of 1897, which entry and money he tendered. This was refused by the customs officials upon the ground that at the time no information had been received at the customhouse that the vessel had arrived within the port. This representative testified that when he made this tender he did not know where the vessel was, but that there had been a wireless report to the effect that the vessel would dock that night about 9 o'clock; that for all he knew the vessel may have been at the time out at sea, and that he took his entry to the customhouse on the chance that perhaps she might be within the port.

It does not appear that any tender of entry or offer to pay duty was made on behalf of the other appellants, and the United States claims that, whatever may be the rights of appellant Kraut under the facts of record, the same rights are not possessed by the other appellants so far as they are affected by an absence of proof of such tenders. It is said by the other appellants that the evidence in the Kraut case was to be considered as applying also to the other cases and that it was so treated by the board. In view of the fact that the board does appear to have assumed that all the evidence related to each case, it will be so treated here.

It is first claimed by appellants that the merchandise was dutiable under the tariff act of 1897 because the steamship carrying the same arrived within the jurisdiction of the collector of the port of New York before midnight of August 5 with intent to unload.

The fact of such arrival and intent can not be denied.

The provisions of section 29 of the act of 1909 would seem to require that entry of the importation should be made and duties paid before August 6 in order to admit of the assessment of duty in accordance with rates of the law of 1897. This was not in fact done, but it is claimed that the tender of entry and the offer to pay the duty was made under such circumstances that the refusal to accept the same by the collector was unlawful, and therefore that appellants should be considered as entitled to the same benefits as if the entry and tender had been accepted, thereby bringing the cases within the principle of United States *v.* Legg (105 Fed. Rep., 930).

In that case section 33 of the tariff act of 1897, which, for the purposes of these cases, is identical with section 29 of the present act, was under consideration. It there appeared that the importing vessel arrived at the port of New York prior to 11.50 a. m., July 24; that in accordance with the usual practice notice of her arrival was at that hour posted in the customhouse; that the act of 1897 did not take effect until 4.06 p. m. of that day; that the official and actual business hours of the customhouse ended at 4 p. m.; that the importer before that hour presented himself at the proper place and with the necessary papers to make an entry of the merchandise and the requisite money to pay the duties thereon under the act of 1894 and tendered both the entry and the payment of duties, which tender was refused by the collector on the ground that, as he claimed, the vessel had not made an entry in accordance with law.

It there appears to have been the claim of the collector that it was necessary for the master of the vessel to repair to the office of the collector of customs, report the arrival of the vessel, file a manifest, etc., as required by section 2774, United States Revised Statutes, before an importer owning merchandise upon said vessel was lawfully entitled to enter the same within the meaning of section 33.

The court disagreed with the collector in this regard, held that the goods imported were subject to duty when the vessel carrying the same arrived within the limits of the port, citing Arnold *v.* United States (13 U. S. (9 Cranch.) 119), and further held that the word "entry" referred to in section 33 meant the ordinary entry papers which the importer is required to file with the collector of customs, and that having duly presented himself and tendered his entry and the proper duties thereon under the act of 1894, the case should be disposed of as if the collector had received the entry prior to 4 p. m. of July 24.

In construing section 29 we have similarly held as to the meaning of the word "entry" therein. United States *v.* Grossfeld, 1 Ct. Custs. Appls., 189 (T. D. 31218).

The foregoing statement of the Legg case readily distinguishes it from the cases at bar because it there appears that the tender of entry and payment of duty was made *after* the vessel arrived in port, while in the cases now before us the undisputed facts show the vessel had not reached the limits of the port when the tenders were made.

The collector of customs was justified in refusing the offered entries at the time they were made because the goods covered thereby had not arrived within his jurisdiction. United States *v.* Hartwell Lumber Co. (142 Fed. Rep., 432), United States *v.* Cordero, 1 Ct. Custs. Appls., 107 (T. D. 31114).

But it is further contended that it was the duty of the collector at the port of New York to have kept his office open so that after the vessel did arrive in port the entry could be made and duty paid.

A fair consideration of this argument involves the inquiry as to the hour at which the steamship *Pennsylvania* in fact arrived within the port limits as well perhaps as to when the knowledge thereof reached not only the collector but the appellants' representative, and the fact must not be lost sight of that the time when the tariff act of 1909 became law was 35 minutes after the customhouse in New York, in the ordinary course of business and pursuant to departmental regulations, would close its doors.

There is nothing in the record, nor has our attention been called to any statute, decision, or ruling that defines the limits of the port of New York.

It appears, however, without dispute, that under the practice prevailing at that port, the first point at which the steamship *Pennsylvania* would enter the limits of the port would be when she crossed an imaginary straight line extending from Hoffmans Island to Gravesend Bay, a short distance northerly from Sandy Hook, and that her first natural stopping place within the port limits would be at quarantine, which is northerly from said imaginary line.

It is not questioned that she passed Sandy Hook at 10.25 and reached quarantine at 10.55 p. m. of August 5, which last-named place she left at 6.45 a. m. August 6, and docked later that day, but at just what time does not appear.

There is no doubt that by appellants and others it was understood that the *Pennsylvania* would probably enter the port sometime August 5, but there is nothing of record to show that they at any time that day possessed any *knowledge* of that fact, and indeed the evidence as to when she did enter the port limits was furnished by the customs officials, whose practice, it seems, was to keep advised of the approach of incoming vessels. The earliest information they are shown to have received of her approach was at 7.25 p. m. of August 5, when she was reported as southeast of Fire Island, which is, so far as we are able to ascertain, outside the port limits.

There is no evidence tending to show that any application was made on behalf of appellants to the customhouse officials or employees on August 5 to keep open so that an entry might be made of any of

the *Pennsylvania's* cargo. Their representative testified that he went to the customhouse twice that afternoon. The first time he informed the deputy collector that he had an entry on the *Pennsylvania* and asked him if he was prepared to accept payment of duties; that thereupon he was told that it would not then be accepted; that a telegram had been sent to Washington inquiring if duties should be accepted or the office kept open later than usual, and that he had better draw his money; that thereupon he procured the money and a few minutes after 4 o'clock again presented himself at the collector's office, made his offer of entry and payment of duty, and was told that they had heard from Washington and that they were to close up and not accept his entries or the duties thereon.

The deputy collector did not in the main disagree with this version of the matter, although he did not think any money was actually mentioned at either interview. The office, he testified, was closed at 4.30 p. m., because it was the usual hour for closing; because the Treasury Department in response to a request for direction in the matter had so advised; and also because no information had then been received at the customhouse that the *Pennsylvania* would arrive in port that day.

We have already held in the case of Gallagher & Ascher *v.* United States *supra,* p. 69 (T. D. 31034), that the provisions of article 1389 of the Customs Regulations establishing the hours of business at the customhouses to be between the hours of 9 a. m. and 4.30 p. m. are reasonable, and in the same case further decided that the mere fact that a new tariff law had been or was about to be enacted did not of itself create circumstances of such a character that it could be said that thereby the "interests of the public service" required the collector to keep his office open to an hour later than the usual closing hour in the regulations prescribed.

If it could be said that a request to the collector to keep his office open later than business hours would change the situation, it already appears that no such request was made in these cases. Evidently it was not made because the appellants' representative had no sufficient information as to the probable hour of arrival of the *Pennsylvania* within the port limits, and in addition to this, at the usual hour for closing the new tariff act had not become law, so that the urgency, if one existed, for an extension of the business hours could not have been apparent to the appellants or their representative before the usual hour for closing had arrived.

But the appellants claim notwithstanding all this that the rights secured to them under the provisions of sections 8 and 9 of Article I of the Constitution of the United States to the effect that all duties shall be uniform throughout the United States, and that no preference shall be given by a regulation of commerce or revenue to ports of one State over those of another, have been unlawfully invaded and devote much of their brief to a discussion of this claim.

Briefly stated, the facts that are claimed to warrant them to invoke these constitutional provisions are that the evidence shows that at the port of Boston on August 5, 1909, the customhouse was kept open for the receiving of entries and the payment of duties thereon until 8.30 p. m. of that day, and from a letter of the collector at that port to the Secretary of the Treasury, dated August 13, 1909, it appears that 44 entries were received at that office after the usual hour for closing had arrived. It also therein appears that the Boston collector's office was so kept open at the request of those expecting merchandise on three steamships due that day, one of which was overdue. The Boston collector so kept his office open without special authority of the Treasury Department, but reported to it on said 13th day of August that none of the entries had then been liquidated, that estimated duties only had been deposited, and that they were, therefore, subject to any such revision as to rates of duty as the department might direct.

It does not appear whether duties on these 44 entries were finally liquidated under the tariff act of 1897 or 1909.

It is not claimed that the tariff law of 1909 is not by its terms applicable uniformly throughout the United States nor is it claimed that any preference is therein attempted to be given by a regulation of commerce or revenue to the ports of one State over those of another, so that the constitutionality of the act itself is not challenged.

The claim really is, therefore, that the said customs regulations and the conduct of the public business as before set forth were such as to prevent the uniformity of the application of the new tariff act throughout the United States and to result in a preference being given by a regulation of commerce or revenue to the ports of one State over those of another.

We confess an inability to recognize any force whatever in this contention.

If the customhouse in New York had been kept open until 8.30 o'clock in the evening of August 5 the same rights, from the appellants' standpoint, would have been enjoyed and could have been exercised by them that were enjoyed and exercised by the importers at the port of Boston. But this could have afforded no relief for the appellants, because it already appears that at 8.30 p. m. on August 5 their importations had not arrived within the jurisdiction of the collector at the port of New York, and therefore, if opportunity so to do had been afforded them they would not have been entitled to make entry of the merchandise involved in these cases. The closing of the office at 4.30 p. m., therefore, affords no ground for any claim that because the collector's office at Boston was kept open to a later hour, the appellants' rights have been invaded. In this connection it may be observed that it does not appear whether the entries which were permitted to be made in Boston after 4.30 p. m. on August 5 were finally liquidated under the rates of duty imposed by the act

of 1897 or the act of 1909, so that neither a lack of uniformity nor the fact of preference is established.

But it is said further that in any event it was the duty of the collector of customs at New York to have kept his office open until midnight on August 5 so that appellants' entries could have been made before the act of 1909 took effect.

If it was the duty of the collector at the port of New York to pursue this course, it would manifestly be the duty of collectors at all the ports of entry throughout the United States to have done the same thing. Hence we are asked to read into the tariff act of 1909 a provision that such collectors were thereby required to keep their offices open and sufficient office force present to receive and attend to any entry of merchandise which might come into their jurisdiction before the 6th day of August, or, if not to read such a provision into the act, to say that by inference such was its effect.

Neither of these positions is tenable.

In section 29 Congress clearly provided under what circumstances importations should be subject to the rates of duty imposed under the new act and specifically provided that merchandise for which no entry had already been made should be dutiable thereunder. Congress will be presumed to have had cognizance of the methods of doing business under general regulations at the various customhouses within the United States, and had it designed to change the general course of business thereat it was easy to have given plain expression to such intention, which was not done. To infer that such was its intent requires a further inference that it is the duty of the collectors of customs throughout the United States to follow the course of legislation upon tariff matters to the end that they may correctly anticipate its outcome, so that if it shall happen that a new tariff act becomes law after the expiration of the prescribed and reasonable hours for doing business, their official force may be recalled and business resumed to meet the emergencies of the situation thereby created. Such a construction could only be required upon the theory that the necessities or interests of the public service require it, and as this court has heretofore said in the case of Gallagher *v.* Ascher (supra) "the public interests are what are expressed by the statute adopted by Congress * * * and the courts can give no consideration to suggestions that it was the duty of the officials to do an unusual act which would be out of harmony with the import of the law."

The construction asked for would greatly interrupt the otherwise orderly and established methods of transacting public business and can not have been intended by Congress.

The judgments of the Board of General Appraisers in these several cases are *affirmed*.

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and DE VRIES, Judges, concur.